**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| BEATRICE BUSH, *et al.*, ) | |
|     ) | |
|             Plaintiffs, ) | |
|     ) | |
|         v.   ) | Civil Action No. AW-06-959 |
|     ) | |
| JOHN E. POTTER, ) | |
|     ) | |
|             Defendant. ) | |

## MEMORANDUM OPINION

Before the Court is Defendant's Motion for Summary Judgment (Doc. No. 43). Plaintiffs, Beatrice Bush and Pamela Jackson, instituted this action for sexual harassment while employed by the United States Postal Service. The record does not reflect responses by Plaintiffs to the Defendant's Motion for Summary Judgment. The Court has reviewed the entire record, including the pleadings and the extensive administrative record and deposition testimony, with respect to this motion and finds that no hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated more fully below, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

Plaintiffs, Beatrice Bush ("Bush") and Pamela Jackson ("Jackson"), filed separate complaints alleging a hostile work environment arising from alleged sexual harassment by Keith Mangum ("Mangum") during their employment with the Defendant, the United States Postal Service (USPS), which the Court consolidated into this matter on February 14, 2008. Bush additionally alleged a claim for quid pro quo sexual harassment. Bush was employed by the United States Postal Service on March 16, 1996, in the bargaining unit position as a Sales and Service/Distribution Associate (formerly referred to as Window Clerk) until her removal on June

13, 2007, for failure to be in regular attendance. Jackson was employed in the same position on November 18, 1986, where she has served her entire 23 year career with Defendant. At the time of the incident both Plaintiffs worked at the College Park Post Office. In February 2005, Robert Raines ("Raines"), who was the Manger of Post Office Operations for the Capital District, assigned Mangum to the College Park Post Office as Officer-in-Charge, where he would provide supervisory relief to Campbell Bell ("Bell") who was Postmaster of the College Park Post Office. This assignment was for career development as Mangum was aspiring to become a Postmaster.

Bush met Mangum in December 2004 when Mangum attended a one-day training assignment at the College Park Post office, and at some point the two exchanged numbers. Bush and Magnum had several conversations on both office and personal telephones. At some point during this month, Bush and Mangum had lunch together where they discussed their "families and personal interest." (Doc. No. 43, 4.) In approximately December 2004, Mangum called Bush to inform her that he had been assigned to the College Park Post office and offered to have sex with Bush before he arrived, which she declined. After this conversation, Bush stopped answering Mangum's calls, and Bush stopped calling upon his arrival at the College Park Post Office. Bush did not report this incident to a designated Postal Service official until months later. Although Bush was on leave when Mangum began working at the College Park Office, they "initially enjoyed an amicable working relationship." (*Id.* at 6.) Bush alleges that on two occasions[1] in March 2005, Mangum "touched the back of her leg as she passed him in the hallway after retrieving a customer's package." (*Id.* at 7.) Bush told Mangum to stop and reminded him to act professionally; however, she did not initially report this incident.

---

[1] There is some discrepancy in the exact number of times that Mangum touched Bush's legs because her Complaint alleges that Mangum touched her leg once. (Bush Compl. ¶ 11.)

Also in March 2005, Bell instructed Mangum to review and send all employees' Family and Medical Leave Act ("FMLA") documentation to Linda Michaels, Capital District FMLA Coordinator, who informed Mangum that Bush would be disqualified for FMLA until she updated her documentation. After Mangum explained to Bush that she need to update her FMLA materials, Bush filed a grievance because she did not believe that Mangum's instructions were legitimate. During the grievance process, Bush learned that she had failed to properly sign her documentation. Bush stopped speaking to Mangum after this incident. On May 18, 2005, while Bush was the only Clerk at the window counter, Mangum instructed Bush to continue assisting a customer in line before she left for her lunch break. Moreover, on May 19, 2005, Bush asked Tonya Fortson, who was Bush's immediate supervisor, to sit down as opposed to stand at the window and to leave early because she had pelvic pain, which Ms. Fortson approved. Bush asserts that Mangum told her to stay and "clear the carriers." Bush did, however, leave an hour and a half early on this day. Lastly, on the same day Bush was allegedly disruptive while Mangum gave a service talk, and Mangum stated that he had resignation papers for anyone who did not want to follow instructions. However, Mangum did not draft, propose, or issue any disciplinary action against Bush during his tenure at the College Park Post Office.

Jackson met Mangum in the mid-1990s when Mangum worked at the College Park Post Office as a Clerk for two weeks, and Jackson found him to be "friendly and playful." (Doc. No. 43, 5.) Jackson did not interact with Mangum again until he returned to the College Park Office in February 2005. Jackson initially welcomed daily conversations with Mangum about their Christian affiliation. Mangum then began to comment on Jackson's appearance and on an almost daily basis would make comments such as she looked good in her pants, that he did not remember her looking that way years ago, that she had a lot of junk in the trunk, and other non-

specific references to her buttocks.  At some point Jackson took offense to these comments, and would sometimes respond to Mangum that she was "married, a Christian woman, or they were just friends." (Doc. No. 43, 7.)  Other times, Jackson would not respond and instead would walk away out of fear for "negative repercussions."  (*Id.* at 8.)  She did not complain about these comments until later.  Moreover, around April 2005, Jackson alleges that Mangum suggested that they go to a secluded place and have fun, to which she responded that she did not cheat on her husband, but did not initially report to a Postal official.  The final incident occurred on April 18, 2005, when Mangum allegedly touched Jackson between her legs, on or near her vagina,[2] as he walked by her and moved his hand for a few seconds.  Jackson felt embarrassed and upset by Mangum's actions, but she neither informed him that his behavior was unwelcome nor immediately reported this incident to a supervisor because she feared Mangum would punish her rejection.  Instead, she discussed the incident with two co-workers, Beverly Snipes and Kelvin Smith, and the next day Smith advised Jackson to report the conduct to Bell.  However, Jackson declined to immediately make a report because she believed the issue would be resolved once Mangum left the College Park Office, which she believed would occur soon after the incident.

On May 20, 2005, Bush, accompanied by her co-worker Ed Walker, complained to Bell that Mangum sexually harassed her and retaliated against her for refusing his advances.  On the same day, Bush learned about Jackson's allegations and informed Bell that Jackson also had problems with Mangum.  After Smith told Jackson that Bell was encouraging employees to come forward, Jackson also reported her allegations of sexual harassment to Bell on the same day as Bush.  Bell allegedly told both Bush and Jackson that he could not do anything about their allegations because he was leaving for vacation.  However, after Bell spoke with both Plaintiffs,

---

[2] The Defendant contends that Jackson inconsistently described where Mangum touched her.  Her descriptions range from describing the incident as Mangum touching her between her legs to more specifically that he touched her vagina.  (Doc. No. 43, Ex. 2, pg. 6.)

he informed Mangum of the allegations and told him to get a witness to appear with him at a meeting he scheduled with Bush for May 23, 2005, the following business day after Plaintiffs reported their allegations.  Bell scheduled a meeting between Bush and Mangum, with Edwina Brown—a representative of the National Association of Postal Services—for them to discuss Bush's allegations.  Jackson was not included in this meeting because she allegedly told Bell that she did not wish to pursue her complaint.  Bush left the meeting shortly after it begin but first informed Mangum that "she did not want to have sex with him and wanted his harassment to stop," and left without waiting for his response.  (Doc. No. 43, 13.)  On March 25, 2005, Bush then reported her complaint to Raines and told him that she and other employees, including Jackson, were being sexually harassed by Mangum.  Raines first spoke to Bell about the incident and then contacted Susan Ward, who was a Manager of Human Resources in the Capital District, and requested that Capital Workplace Improvement Analyst ("WIA") conduct an internal investigation.  Meanwhile, Raines instructed Mangum to report to the Laurel Post Office pending the outcome of the investigation.  WIA began investigating on May 25, 2005, and interviewed both male and female employees, including Bush, Jackson, and Mangum.  Mangum later "returned to his position as Account Sales Manger in Washington, DC, and did not have any other interaction with Plaintiffs after May 25, 2005.  Both Plaintiffs filed formal EEO complaints on August 4, 2005, and Defendant's issued a Final Agency Decision on January 9, 2006.  After receiving their right to file suit notification, Plaintiffs instituted this action on April 14, 2006.

## STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The Court must "draw all justifiable

inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## ANALYSIS

In the absence of direct evidence of discrimination or retaliation, as is the case here, a plaintiff's claims of discrimination are analyzed under the burden-shifting proof scheme established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of discrimination or retaliation. *Id.* at 802. After establishing a prima facie case, the burden shifts to the Defendant to proffer a "legitimate, nondiscriminatory reason" for the challenged conduct. *Id.* Upon this showing, the plaintiff must prove by a preponderance of the evidence that the reasons stated by the employer are actually pretext for a discriminatory purpose. *Id.* at 804. A plaintiff can demonstrate pretext if in addition to satisfying a prima facie case there is "sufficient evidence . . . that the employer's asserted justification is false" or "unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Tx. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

**I.   Sexual Harassment – Hostile Work Environment**

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1) (2006). To move forward with a hostile-environment sexual harassment claim the plaintiff must demonstrate that the conduct: "(1) was unwelcome, (2) was because of her gender . . . , (3) was sufficiently severe or pervasive to alter plaintiff's working conditions and to create an abusive work environment, and (4) was imputable on some factual basis to the employer." *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). In order to show that the conduct was based on the plaintiff's sex, there must be a demonstration that "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Harris v. Forklift Sys., Inc.*, 210 U.S. 14, 25 (1993) (Ginsburg, J. concurring). The Defendant did not argue that the Plaintiffs failed to satisfy the first-two elements; instead, it argues that Plaintiffs' claims fail as a matter of law on the remaining elements.

**A.   Severe and Pervasive Sexual Harassment**

The third element requires that the plaintiff subjectively considered the alleged harassment to be severe or pervasive, and that an objective and reasonable person would reach the same conclusion. *Harris*, 510 U.S. at 21-22. The purpose of this standard is to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In determining whether a reasonable person could find the behavior sufficiently severe or pervasive, courts consider the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it reasonably interferes with an employee's

work performance; [and] its affect on the employee's psychological well-being." *Harris*, 510 U.S. at 23. The Fourth Circuit explained that

> The task then on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere.

*Davis v. Dimensions Health Corp.*, 639 F. Supp. 2d 610, 615 (D. Md. 2009) (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 316 (4th Cir. 2008)). In *Alberto v. City of Salisbury*, this Court found that the plaintiff had not shown that the alleged harassment was sufficiently severe or pervasive, especially where she was not propositioned for sex or touched inappropriately. 422 F. Supp. 2d 549, 559 (D. Md. 2006).

Here, Bush claims that Mangum propositioned her for sex on one occasion in December 2004 and then touched her legs at best on two occasions in March 2005. Jackson alleges that between February 2005 and April 2005, Mangum commented almost daily about her buttocks, suggested that they engage in sex on one occasion, and even once touched her between her legs near or on her vagina for a few seconds. Defendant suggests that these touching incidents could have been accidental or merely a "momentary contact between people who had shared a personal friendship outside of work." (Doc. No. 43, 21.) However, for purposes of summary judgment, the Court must consider the allegations in the light most favorable to the Plaintiffs and cannot presume such justifications for the alleged touching. Moreover, Defendant briefly argues that these incidents are not severe or pervasive and cites to several cases from other jurisdictions. However, looking at the factors articulated in *Harris*, it appears to this Court that the incidents that Jackson alleges occurred on a daily basis, involved physically touching her on or near her vagina, and included a proposition for sex, all of which could lead a reasonable jury to find that the alleged harassment of Jackson was sufficiently severe and pervasive. On the other hand,

when analyzing Bush's claims under these factors, the Court finds that a single request for sex and two touches to the back of the leg over a three month period, although inappropriate, could not led a reasonable jury to conclude that Bush's allegations were sufficiently severe and pervasive.

### B. Employer's Affirmative Defense

The final element of a sexual harassment claim requires the plaintiff to show some basis for holding the employer liable for the behavior. When a coworker commits the sexually harassing acts, the employer is liable under a negligence theory if it knew or should have known of the harassing conduct but failed to take corrective measures. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003). However, when a supervisor "with immediate (or successively higher) authority over the employer" is the alleged perpetrator of the harassment, then the employer is vicariously liable when the supervisor's harassment created a hostile work environment. *Id.* at 334. Where the plaintiff has not suffered a tangible employment action, an employer may offer a two-part affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. On the other hand, an employer cannot invoke this affirmative defense when the supervisor's harassment resulted in tangible employment action. *Id.* at 808. As articulated in *Burlington Industries, Inc., v. Ellerth*, "tangible employment action in most cases inflicts direct economic harm," and often involves "discharge, demotion, or undesirable reassignment." 524 U.S. 742, 767 (1998); *see also Reinhold v. Virginia*, 151 F.3d 172, 175 (4th Cir. 1998).

"Adoption of an effective policy on sexual harassment is an important factor in determining whether [the employer] exercised reasonable care to prevent any sexually harassing

9

behavior." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244 (4th Cir. 2000). Moreover, whether an employer took prompt corrective measures is often demonstrated when the remedial effort was reasonably calculated to end the alleged harassment. *See Yancy v. Nat'l Ctr. on Insts. & Alternatives*, 986 F. Supp. 945, 953 (D. Md. 1997). "A demonstration [that the employee failed to use any complaint procedure] will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 808; *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir. 2001). As explained in *Faragher*, a victim of sexual harassment "should not recover damages that could have been prevented if" she had "availed herself of the employer's preventive or remedial apparatus." *Faragher*, 524 U.S. at 807. "A generalized fear of retaliation does not excuse the failure to report sexual harassment" and "an employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive" measures offered by the employer. *Barrett*, 240 F.3d at 267 (refusing to accept plaintiff's argument that reporting harassment would be futile because the management team were friends).

Here, neither Plaintiff was "fired, demoted, [] denied a promotion," or otherwise experienced a "significant change in their benefits or responsibilities" due to Mangum's allegedly harassing conduct. Thus, the Defendant can, and has, asserted the *Faragher/Ellerth* affirmative defense to avoid liability in this matter. First, the Defendant has demonstrated that it has a viable anti-harassment policy, widely communicated to employees and posted in the College Park Post Office, which includes a complaint procedure. Second, the Defendant acted promptly to correct the alleged harassment within one week after Plaintiffs first reported Mangum's sexually harassing conduct. The Plaintiffs first complained to Bell, who was the Postmaster of the College Park Post Office, about the conduct on May 20, 2005, a Friday, who

scheduled a meeting between Bush and Mangum for the following Monday, May 23, despite his upcoming vacation. Jackson did not wish to participate in this initial meeting. After these meeting proved unsuccessful, Bush reported the incidents to Raines, the Manger of Post Office Operations for the Capital District, on May 25, 2005, and on the same day Raines initiated an internal investigation and transferred Mangum to the Laurel Post Office. The internal investigation began on May 25, 2005, as well. Third, the transfer of Mangum to another Post Office appears to have effectively corrected the harassing conduct as the Plaintiffs did not complain of recurring harassment afterwards. Thus it appears to the Court that the Defendant has satisfied the first element of the affirmative defense.

The Defendant also argues that Plaintiffs unreasonably failed to utilize its anti-harassment complaint procedure by waiting months after the alleged incidents of harassment occurred before reporting to a Postal official. Bush claims that the first incident occurred in December 2004 when Mangum propositioned her for sex. However, there is no evidence that Bush reported this incident until May 20, 2005, nearly five months later. The second incident of sexual harassment allegedly occurred in March 2005 when Mangum touched Bush's legs. Defendant argues that these incidents could have been prevented if Bush had made a complaint after the first incident. Bush's complaint alleges that the Defendant's anti-harassment policy was inadequate and that Bell, the person to whom such complaints should be made, was close friends with Mangum. However, the Defendant's policy allowed employees to make complaints to any supervisor, manager, or to the Human Resources Office. Jackson's failure to report her alleged incidents of sexual harassment are likewise unreasonable. Mangum allegedly began sexually harassing Jackson in February 2005 when he commented on her sexual body parts. He also allegedly propositioned Jackson for sex sometime in April 2005, and touched her on or near her

vagina on April 18, 2006. Jackson did not make her complaints known to appropriate Postal officials until May 20, 2005, because she claims that she feared retaliation from Mangum. However, as articulated in *Barrett*, neither the Plaintiffs' generalized fear of retaliation, nor their belief that reporting harassment would be futile because Bell and Mangum were friends, excuses the Plaintiffs' failure to report the incident until months later. Therefore, Defendant has satisfied the *Faragher/Ellerth* affirmative defense and the Plaintiffs claims cannot survive the summary judgment motion.

## II.  Sexual Harassment-Quid Pro Quo

Defendant has interpreted Bush's complaint to also allege a claim of retaliation; however, a review of the complaint seems to suggest that her claim is not of retaliation but of quid pro quo sexual harassment. A claim for retaliation under Title VII would require Bush to engage in a protected activity, such as "ma[k]e a charge, testif[y], assist[], or participate[] in any manner in an investigation, proceeding, or hearing . . . ." and then to have been retaliated against for such participation. 42 U.S.C. § 2000e-3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006). Here, it is clear that all of the allegedly retaliatory actions occurred prior to Bush making a complaint of harassment, and to the extent that Bush was attempting to make out a claim for retaliation, such a claim fails as a matter of law.

In the Fourth Circuit, to establish a quid pro quo sexual harassment claim the plaintiff must demonstrate the following: "(1) the employee belongs to the protected class, (2) the employee was subjected to unwelcome sexual harassment, (3) the harassment complained of was based upon sex; (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges or employment; and (5) the employer . . . knew of should have know of the harassment and took no remedial action." *Moret v. Green*, 494 F. Supp. 2d 329, 340 (D. Md. 2007) (citation omitted). As discussed above, a tangible

action involves the demotion, termination, or reassignment of the plaintiff, and generally "inflicts direct economic harm" on the plaintiff. *Ellerth*, 524 U.S. at 767.  A plaintiff must provide evidence of "a nexus or casual connection between the acceptance or rejection of the unwelcome sexual advances and the employment decision complained of." *Briggs v. Waters*, 484 F. Supp. 2d 466, 479 (E.D. Va. 2007).  The circumstances surrounding the employment decision, including the close temporal proximity between the sexual advance and employment action or whether the harasser made or influenced the decision, should guide the court in its analysis of the fourth element.  *See Briggs*, 484 F. Supp. 2d at 479-80.  Moreover, the fifth element is automatically satisfied if a supervisor committed the sexual harassment.  *Id.* (citing *Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999)).  Finally, Defendant can avoid liability by establishing the *Faragher/Ellerth* affirmative defense.  *Ellerth*, 524 U.S. at 765.

      Here, assuming arguendo that Bush has met elements one, two, three, and five of a sexual harassment quid pro quo claim, the record does not reflect that Bush suffered a tangible employment action that affected the terms and conditions of her employment.  Bush claims that several of Mangum's actions towards here were in retaliation for her declining his sexual advances in which Mangum allegedly invited Bush to have sex in December 2004 and then touched her legs in March 2005.  As outlined in the Defendant's Motion for Summary Judgment, the first incident involves Mangum's review of her FMLA documentation in March 2005.  However, as indicated by Defendant, Bell instructed Mangum to review FMLA documentations of all plaintiffs for a final review by a FMLA Coordinator.  A review of Bush's file revealed that she failed to properly sign her documentation.  There is no evidence that the review of Bush's FMLA file caused any change in the terms and conditions of her employment, and in fact, seemed to benefit Bush.  Next Bush claims that Mangum requested that she finish severing a

customer in line before taking her lunch break. Although Bush may have been slightly inconvenienced by the delay of her lunch break, it appears that such a delay did not result in any change in Bush's terms of employment. Moreover, the Defendant explained that Mangum asked Bush to finish serving the customer because she was the only employee at the service window.

Third, Bush claims that Mangum required her to "clear the carriers" after she had been approved to sit down while working and to leave early due to pelvic pain. Again, even if Mangum's decision was inconsiderate or caused Bush some inconvenience, it does not appear to have had any impact on her employment conditions, and the Defendant represents that she did indeed leave work early that day. Finally, Bush alleges that Mangum threatened to fire her; however, Defendant asserts that Mangum's threat resulted from Bush being disruptive during his service talk. Defendant contends that Mangum never followed through on the threat and "never drafted any disciplinary action against Bush." (Doc. No. 43, 29.) The Defendant represents that Bush was eventually terminated, but only after she failed to appear for work on a regular basis. Accordingly, the Court finds that Bush has not suffered any tangible employment action as a result of Mangum's decisions and cannot make out her prima facie case for quid pro quo sexual harassment. Therefore, the grant of Defendant's Motion for Summary Judgment is appropriate.

## **CONCLUSION**

For the foregoing reasons the Court will **GRANT** Defendant's Motion for Summary Judgment (Doc. No. 43). A separate order shall follow this Memorandum Opinion.

December 21, 2009 /s/
    Date     Alexander Williams, Jr.
        United States District Court Judge